UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

       Plaintiff,          Case Nos. 3:23-cr-180-HES-SJH
                      3:25-cr-70-HES-PDB

-vs-
                  August 20, 2025
NOAH MICHAEL URBAN,
                  10:04 a.m.
       Defendant.
                  Courtroom 10C
_____

**TRANSCRIPT OF SENTENCING**
BEFORE THE HONORABLE HARVEY E. SCHLESINGER
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S**

**GOVERNMENT COUNSEL**:

    **John Cannizzaro, Esquire**
    United States Attorney's Office
    300 North Hogan Street, Suite 700
    Jacksonville, FL  32202

**DEFENSE COUNSEL**:

    **Kathryn Sheldon, Esquire**
    Federal Defender's Office
    200 West Forsyth Street, Suite 1240
    Jacksonville, FL  32202

OFFICIAL COURT REPORTER:

    Shelli Kozachenko, RPR, CRR, CRC
    221 North Hogan Street, #185
    Jacksonville, FL  32202
    Telephone:  (904) 301-6842

                  (Proceedings reported by stenography;
                  transcript produced by computer.)

2

## P R O C E E D I N G S

August 20, 2025                                    10:04 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  United States District Court in and for the Middle District of Florida is now in session, the Honorable Harvey E. Schlesinger presiding.

Please be seated.

THE COURT:  Call the next case, please.

COURTROOM DEPUTY:  Case Nos. 3:23-cr-180-HES-SJH and Case No. 3:25-cr-70-HES-PDB, United States of America versus Noah Michael Urban.

Counsel, please state your presence for the record.

MR. CANNIZZARO:  Good morning, Your Honor.  John Cannizzaro on behalf of the United States.

MS. SHELDON:  Good morning, Your Honor.  Kathryn Sheldon on behalf of Mr. Urban this morning.

THE COURT:  Come on up here, Mr. Urban.

How old are you today?

THE DEFENDANT:  I'm 20 years old.

THE COURT:  And how far did you go in school?

THE DEFENDANT:  I graduated high school and did about a year of college.

THE COURT:  Can you read, write, and understand English?

THE DEFENDANT:  Yes, sir.

THE COURT:  Have you had any alcoholic beverages, drugs, or narcotics in the last 48 hours?

THE DEFENDANT:  No, sir.

THE COURT:  Other than the information that is contained in the presentence report concerning your health, have you ever been treated, other than what's in there, for any mental or emotional disorders?

THE DEFENDANT:  No.

THE COURT:  Okay.  The record in this case should reflect that in addition to the presentence report, I have read the sentencing memorandum, which is docket entry No. 78, in this case.

There is an addendum that I'll get to in just one second.

The record in the case will reflect that on April 4th of this year, you entered a plea of guilty to Count One, a conspiracy to commit wire fraud, in violation of Title 18 of the United States Code, Section 1343 and 1349, and Count Nine, wire fraud, in violation of Title 18 of the United States Code, Sections 1028A(1) [verbatim] and 2 of the indictment, and that would be in the Jacksonville case, 3:23-cr-180, and to Count One of an indictment in 3:25-cr-70, which was the transferred case from California charging you with conspiracy to commit wire fraud, in violation of Title 18 of the United States Code, Sections 1349 and 1343.

And the Court has previously adjudged you guilty of those offenses and accepted your plea of guilty.

Have you had an opportunity to read and discuss the presentence report that's dated August 6th with your counsel?

THE DEFENDANT:  Yes, sir.

THE COURT:  And other than the objections that are in the addendum, which is docket entry No. 20, are there any other objections to the factual accuracy of the report?

From the government?

MR. CANNIZZARO:  No, Your Honor.

THE COURT:  How about from the defendant?

THE DEFENDANT:  No, sir.

THE COURT:  And any other objections to the probation officer's calculation of the guidelines outside of the addendum?

From the government?

MR. CANNIZZARO:  No, Your Honor.

THE COURT:  From the defendant?

MS. SHELDON:  No, Your Honor.

THE COURT:  Okay.  Why don't you have a seat, and let's take up the first objection, which is the victim impact, the amount of the loss.

MS. SHELDON:  Yes, Your Honor.

We noted in some of the victim impact statements that were submitted to the Court the calculation submitted by the

victims did not match what either the defense or the government believed to be the true value of the Bitcoin that was seized at the time.

Because of the nature of Bitcoin and how its valuation -- and all cryptocurrency, frankly, can change in value by the minute or the day, it is very difficult to ascertain a loss amount.

So specifically Mr. Urban requests that this Court order restitution in the amount that was agreed upon by the defense and the government, and those restitution amounts are reflected in the plea agreement.

THE COURT:  Well, let me just ask you this then.

MS. SHELDON:  Yes, sir.

THE COURT:  Do you have a plea agreement in front of you?

MS. SHELDON:  Yes, sir.  Now I do.

THE COURT:  Okay.  Turn to page 7 --

MS. SHELDON:  Yes, sir.

THE COURT:  -- paragraph 6; page 8, paragraph 7. Have you added those up?

MS. SHELDON:  Yes, Your Honor.  We've -- I mean, we believe that the amounts reflected in the plea agreement --

THE COURT:  Well, what figure do you come up with?

MS. SHELDON:  I believe it was the 13 million, Your Honor.

THE COURT:  Well, maybe a little bit less than the 13 million.

And you want to argue that the amount of the loss doesn't come up to 9.5 million, if I read your objections correctly.  So what -- what are we dealing with?

I'll go through each one, and you can sit there and tell me if my math is identical with your math.

MS. SHELDON:  Your Honor, I don't think --

THE COURT:  Paragraph 6, I totaled paragraph 6 to be $2,858,137.

Paragraph 7, I totaled paragraph 7 to come to, the first part, $5,323,354.

And then with respect to the second portion, which lists Victims 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 30, and 31, to come to $2,749,431, which is a total of $10,930,922.

Now, somehow, which I don't know how, I received a victim impact statement from a man by the name of Connolly, which I understand doesn't apply in this case at all.  How I wound up with it -- because when I did the victim impact statements, when I got to Connolly, I thought he was part of this case.  And it would add a lot.  It's about 4 million something, but he's not involved.

So I come up with a total of the 10,930,000.  But I'm going to let you -- you say that it doesn't equal X.  The government says it does equal X.  So you want them to start --

MS. SHELDON:  Your Honor, I --

THE COURT:  -- if my figures are not right?

MS. SHELDON:  I don't believe that that was the issue that I had raised in my objection to the memo.  My issue --

THE COURT:  No.  The presentence report says that there was -- and the plea agreement, right, there's an argument about the amount of the loss.

You say it should not be more than 9.5.  The government says it's more than 9.5 up to 20.  That's the objection.  That's -- it's stated in the presentence report, okay?

MS. SHELDON:  Yes, sir.  After reviewing all of that --

THE COURT:  Yes.

MS. SHELDON:  -- that is not an objection that the defense continues to make.  We are in agreement with the restitution --

THE COURT:  Okay.

MS. SHELDON:  -- at 10 million.

THE COURT:  Okay.  Good.  That takes care of that issue.

MS. SHELDON:  Yes, Your Honor.

THE COURT:  Okay.

MS. SHELDON:  The only objection that we raised in addition to the presentence report that was filed with the

Court was specifically that some victims submitted impact statements that were in disagreement with the numbers that the government and the defense had come to.

THE COURT:  Originally, yeah.

MS. SHELDON:  Yes.

THE COURT:  Because I assume that they're looking at, "Oh, I lost the money in February, and now I'm writing this in July.  I'll figure what it's worth in July" --

MS. SHELDON:  Yes, Your Honor.  So we're --

THE COURT:  -- which would be a lot more.

MS. SHELDON:  Yes, Your Honor.

THE COURT:  And it kept going up rather than down.

MS. SHELDON:  So we're asking the Court to accept the plea agreement and the numbers that we have come to in --

THE COURT:  Okay.

MS. SHELDON:  -- in negotiations.

THE COURT:  Well, I have ...

Okay.  The courtroom deputy had given me a three-page list.

MS. SHELDON:  Yes, Your Honor.

THE COURT:  Okay.  Which he says he got from the government.

MS. SHELDON:  Yes, Your Honor.

THE COURT:  Now, is this the correct list?

MS. SHELDON:  Yes, Your Honor.

THE COURT:  Okay.  What does the -- what does -- I just got this this morning.

What does the total of this come to?

MS. SHELDON:  Your Honor, the total on that document is 13 million, 418 thousand --

THE COURT:  And that -- that was the agreed-upon forfeiture from the plea agreement.

MS. SHELDON:  Yes, Your Honor.

THE COURT:  Okay.

MS. SHELDON:  And --

THE COURT:  That's all I'm going to use on the restitution.

MS. SHELDON:  Yes, Your Honor.  I --

THE COURT:  Yes.

MS. SHELDON:  Defense just wanted to make sure that the Court was relying on the numbers provided --

THE COURT:  Yes.

MS. SHELDON:  -- by the government --

THE COURT:  Yes --

MS. SHELDON:  -- in the --

THE COURT:  -- in the plea agreement.

MS. SHELDON:  In the plea agreement --

THE COURT:  Yes.

MS. SHELDON:  -- not necessarily from the --

THE COURT:  Yes.  I worked it from the plea

agreement.

MS. SHELDON:  Okay.

THE COURT:  That's why I was reading off the plea agreement.

MS. SHELDON:  Yes, sir.

THE COURT:  This now is a composite of it.

Okay.  So does that take care of the objection to paragraphs 30(a) through (e)?

MS. SHELDON:  Yes, Your Honor.

THE COURT:  Okay.  Then the second objection that you made deals with paragraphs 38, 43, 44, 47, and 77.  And that deals with you object to the probation officer's two-level enhancement for substantial hardship on one or more victims, and I'll get into that in just a second.

I understand there is one victim present.  Am I correct?

MR. CANNIZZARO:  Yes, Your Honor.

THE COURT:  And the rest, I'm ready to tell you what I have found in the victim impact statements, but I'll listen to the government first.  And I have this one victim that's present.  I believe he did file a victim's impact statement.

This is the man who's a retired firefighter?

MR. CANNIZZARO:  That's a -- that's a different victim, Your Honor.

THE COURT:  Different victim?

MR. CANNIZZARO:  Yes, Your Honor.

THE COURT:  Who is the victim that's here?  Could you raise your hand?

UNIDENTIFIED PERSON:  (Raised hand.)

THE COURT:  In the back.  Okay.

Which is his victim impact statement?

MR. CANNIZZARO:  It was Victim 22.

THE COURT:  Okay.  Well, let me -- let me do this.  Maybe I'll listen to the victim now, and then I'll go through the victim impact statements that I have read with respect to this issue of, other than the monetary loss, what have people suffered.

MR. CANNIZZARO:  Your Honor?

THE COURT:  Go ahead.

MR. CANNIZZARO:  I had an opportunity to speak with that victim this morning.

THE COURT:  Yes.

MR. CANNIZZARO:  He does not want to -- he -- initially he thought about testifying in front of Your Honor about victim impact.

THE COURT:  Yes.

MR. CANNIZZARO:  After thinking about it some more, he does not want to do that.

THE COURT:  Oh, okay.  That's fine.  No problem.

So let me go through some of these victim impact

statements.  And although the probation officer has outlined it, if you could start -- do you have document 20 with you? I'm looking at page 14 of 107.

This is Victim R.K.:  "I'm stuck babysitting a 20-year-old car that won't pass emissions.  I don't like writing this because it requires me reliving the nightmare.  I can feel my heart speeding up and pounding in my chest right now, and I'm actually experiencing shortness of breath.  Kraken forced me to work hard to prove my identity before they would allow me access to my own accounts.  That took three days.

"I was in a panic, frantic to find out how this happened.  For weeks I woke up every night in cold sweats.  I can't overstate the emotional impact that this intrusion into my personal life has had on my peace of mind."

Next paragraph, he needed to take -- this is J.G.  He needed to take a job as a courier until he was unable to continue to work due to the physical rigors of the job.  It further states the crime put him and his family in some difficult times financially and emotionally.

And if you look on page -- document 20, I believe his actual stuff is on page 69 and 70, and -- that would be R.K.'s. J.G.'s is document 20, pages 60 and 61.

Then we have R.B. on page 65 and 66 of -- and 67 of document 20.  "When I realized the substantial impact to a fund I had set up in order to give in vitro fertilization

treatments" -- R.B. also said he experienced psychological damage resulting in behavioral changes not limited to the following:  fear of investing, loss of security, depression, public embarrassment, difficulty at work, overspending, and an opportunity cost due to fear of my investments.

G.T.:  "Had I still had access to these funds, I would have been in a position to meaningfully" play -- "pay down personal debts, beginning to set money aside for my" college -- "my children's college education.  That opportunity was taken from me.  The financial harm is real."

Well, we're not talking about that.

"It's harder to quantify the psychological impact. The violation of my personal accounts left me feeling exposed and vulnerable.  It eroded my sense of security, not just in digital systems but in my daily life.  This experience has burdened me not only financially but also emotionally and mentally.  It's something I still carry with me today."

Then if you would go to page 30 of the 107-page document 20, and let me just see if I can -- this is from a B.D.:  "The dreams and aspirations my wife and I held for 21 years in providing for our children has been shattered.  The emotional well-being and educational opportunities for my 17-year-old son and 14-year-old daughter, who has a learning disability, have been severely impacted.

"Despite the adversity and personal health challenges

I face due to epilepsy, I remain reflecting the pain and suffering caused.  My daughter has a learning difficulty, and she was getting help, but this has stopped.  My children's education has been jeopardized.  My dad delayed his retirement to make sure my family was going to make it."

C.T., on page 48 of 107, she checked off that she suffers substantial harm in her ability to make -- get credit.  That's in addition to -- and your contention is checking off suffered substantial loss of retirement, education, or other savings is not what the enhancement applies to.

Here's another one.  This is from F.S.:  "Made a substantial change to my employment.  Made a substantial change to my living arrangements," and, "Suffered substantial harm to my ability to obtain credit."

Page 60 of the 107, J.G., he checked off made a substantial change to his employment, and this is what he wrote:  "He stole a major portion of my retirement account.  I was" 72 year old -- "72 years old when the crime occurred.  As a result I needed to take a job as a courier until I was no longer able to withstand the physical rigors of the job.

"I worked from January of '23 to March of '25.  I sustained several falls and was unable to continue to work.  I will be having both knees replaced later this year.  Needless to say, the crime put me and my family through some difficult times, both financially and emotionally."

M.G. checked on his victim impact he had to make a major change in his employment.

Then we have R.B.:  "Unfortunately, we have to pay for IVF to make our dreams come true, and the additional increased medical costs and procedures not covered by insurance can cost well into the six-figure range, taking years to complete after financing has been secured.

"In addition to the costs, I have experienced psychological damages resulting in behavioral changes," and I had mentioned what those were before.

Here's the one that I was talking about before that I thought this was the victim that was here.  R.K., a 68-year-old retired firefighter, and this is the man that was talking about his car before.

"I was at wit's end, frantically trying to do whatever I could to prevent further intrusion into my finances and my life.  I became very paranoid, and I still am to some extent.  I even questioned my next-door neighbor's teenage son to see if he might have been the one involved.  His parents took it very personally.  They have never forgiven me.  It ended my longtime friendship with them, and the loss continues to hurt me today."

And then we have one from E.V., who's 69 years old, retired, and "It wiped out my retirement account."  I think it was over a million dollars.

So those are some of the victim impact statements that I have looked at.

And I'll listen to your argument about the two levels shouldn't apply, and then I'll listen to what the government has to say before ruling.

MS. SHELDON:  Yes, Your Honor.

With regard to significant financial impact, the main issue in this case is that Mr. Urban did not steal money.  He stole cryptocurrency, and there's actually a very significant difference between money and cryptocurrency.  They are regulated differently, and they are different assets as characterized by the SEC and the government.

Crypto --

THE COURT:  It's not legal tender.

MS. SHELDON:  It's not legal tender.  It's not money.

THE COURT:  Yeah.

MS. SHELDON:  So it is not an investment.  Pursuant to ERISA or the SEC, it does not get regulated as any other investment would.

So defense counsel is not trying to excuse Mr. Urban's conduct or say that --

THE COURT:  You're just saying you shouldn't treat it like it's money.

MS. SHELDON:  We shouldn't treat it like it's money.

THE COURT:  Yes.

MS. SHELDON:  Yes, Your Honor.

THE COURT:  Okay.  So I'll tell --

MS. SHELDON:  And so that would be --

THE COURT:  I'll tell you a famous story that I heard as a little kid.  I think I may have been in the third grade, and we visited an art museum.  And people were talking about what's the value of canvas and paint until somebody paints on it?

And this is the story I heard from one of the chaperones with us who had gone to a millinery company to see how hats were made, and this is what the hatmaker said.

"Woman ordered a hat.  I made the hat.  Woman came in and tried the hat on and thought it was beautiful.  And I told her what the price of the hat was and the woman said to me, 'It costs that much to make a ribbon hat?  How much was the ribbon?'"

And the milliner took the ribbon hat and pulled it apart and said, "But, ma'am, you can have the ribbon for nothing."

That's the world we're living in today.  I understand the point that you're making, and the issue is whether a loss to somebody should be treated as a loss whether it's in dollars or whether it's a painting or a hat.  So I understand the argument that you're making.

I have another case I -- and I want to tell you.  In

your memorandum, if you look on page 7, you wrote about cryptocurrency.

MS. SHELDON:  Yes, sir.

THE COURT:  I put a big sticker to make sure that my law clerk xeroxes this to put it with my other file --

MS. SHELDON:  Okay.

THE COURT:  -- where a woman was trying to pay a mortgage by writing on the bill that she received for the mortgage payments, "I pay this," and signed her name and sent it back and claimed that she paid the mortgage.  Didn't have to be legal tender and decided actually the Federal Reserve statute is saying that she was entitled to do this.  So I'm going to quote you in -- in that case.

But I understand what your argument is.

MS. SHELDON:  Yes, Your Honor.  And more specifically, these cryptocurrencies are not tied to any hard asset, so the value of it can change in an instant.  They can become valueless.

So in extending this argument -- and everyone who invests in these items should know because it says directly on the websites that these are not financially protected.  These are not insured.  It's essentially speculation.

So when people buy cryptocurrency, they're hoping that it's going to see a huge spike, and up to now we have seen huge spikes in some and we've seen others completely wiped out.

But putting needed liquid assets into something that is so dangerous and so unregulated and so volatile begs into question whether these funds are really something that are, like, needed and depended upon enough to sort of wipe out somebody's future, right?

So theoretically, one could say investing all of your money, all of your investment, all of your retirement into something that can go to zero in a snap, in a second, that's not insured, may not be the wisest financial decision to protect yourself.

And by requiring the victims to show their net worth, their assets, and to determine, then, how much of that was actually in cryptocurrency, I think, is what is required. Because most of the people who are investing and speculating in cryptocurrency are millionaires, are people that have significant assets, assets that they can lose without having these financial concerns.

And it may be that in Mr. Urban's case that was not true. Maybe some people made reckless investments with all the money that they had. The issue that defense counsel takes with giving him the enhancement is that we asked for some proof of their net wealth, not just a statement, "Oh, I can't get a new car," to make the determination that it actually was a substantial financial burden on the person.

In the same vein, one can say, well, if these funds

are needed now to pay for college or in vitro, it seems a little concerning that they may be in -- in a product that is not insured, that is not protected, and that can go to zero in literally a second.

And so from that perspective, defense counsel was not able to find any case where cryptocurrency theft had resulted in a substantial financial hardship that was assessed by the probation department or by the government.

And it's our position that it's very hard to make that when we have something that is not legal tender, and cryptocurrency can't be used to pay your mortgage.  It can't be used to buy your car.  It can't be used to pay your hospital bill.

And in that way what Mr. Urban and his co-conspirators stole was sort of the hope or the dream of a realized speculation, because until the money is turned back into money, it's not money.  It's a dream.  It's a hope.  It's a goal.

And we would argue that stealing someone's hope or goal is bad and it will be punished, but that is not the same as stealing money that can be immediately used to purchase those items.

And so it's much more of a -- just like a what is it? Is it actual currency?  Is it something that you can spend and buy, or is it a speculative hope?  Like a baseball card or, you

know, any other item that you may invest in is only worth what someone will pay you for it.

Because you can't go out and -- like, where you could use diamonds to do things or copper or other things, that's just not the case with Bit- -- with Bitcoin or any other cryptocurrency.

So that's the defense's argument, Your Honor.

THE COURT:  Thank you.

Mr. Cannizzaro?

MR. CANNIZZARO:  Your Honor, I'm going to talk in two different -- I guess two different arguments here.

First, this was reckless.  Well, I don't think that matters.  I could take every cent I own right now out of the bank, put it on my person, walk down the street with a giant sign on me saying "I got" -- I don't know -- "$2,000 in cash on me," and I could be robbed.  Someone could take that money from me.

Was that reckless, me doing it?  Absolutely.  Should I have done something else with the money?  Probably.  But I had decided it was my money.  I was going to do what I want with it.

Does that change the fact that if somebody robs me of that money, that I was asking for it, that I should not be compensated for it, that it was all of the money that I had? No.

That argument of, "Well, it's not protected by the government.  It's not regulated.  It's not FDIC insured," that has nothing to do with the fact that we have over $13 million worth of money that was taken from these victims, the 60 victims.

And there is nothing to dispute the fact that you had people that were not millionaires, that were retired firefighters.  Mr. Dye flew in here from Minnesota.  His kids were starting high school at schools there where he lost money.

So the fact -- if you want to call it reckless -- I'm not calling it reckless.  That's what the defense's argument's saying.  The fact is that if it was a reckless investment, not significant.  What matters is, is it was their money, it was taken from them by Mr. Urban, and they suffered a substantial financial loss.

As far as this Bitcoin, "Well, it's not really real," I looked today at the market.  The market cap for cryptocurrency today, how much money was invested in cryptocurrency, $3.92 trillion.  That is not a dream.  That is not a hope.  That is money.

Just last week, it was signed into law -- an executive order, actually, democratizing access for 401(k)s.  401(k) plans are now going to -- they're trying to lay the groundwork for alternative investments such as cryptocurrency.  People's 401(k)s, they're going to be looking at possibly using

cryptocurrency as a means of investment.

A baseball card?  A hope?  This is real money.

One in six adults have invested in cryptocurrency. 14 percent of United States adults have Bitcoin.  In comparison, 26 percent own stocks.  562 million people own cryptocurrency, which is a 33 percent increase since 2023.

And you have 60 people in the community here in the Middle District and the Central District of California telling you they were investing in it, they thought it was something good for them and their family, and they lost it.  And it was a substantial loss to a large percentage of them, so I think he should get the enhancement.

Thank you.

THE COURT:  Anything else?

MS. SHELDON:  Your Honor, the only thing that I would point to is that Mr. Urban's crimes were done much before any sort of executive enhancement [ verbatim].  These crimes occurred between 2020 and 2023 when the market was much different.

And it remains unregulated.  ERISA still has not approved crypto to be in any sort of portfolio.  And there are new cryptocurrencies that are invented every day, some by the president, some by Elon Musk.  And that's just the thing.  They can just be invented.

But defense counsel's perspective is that the

24

government has not shown a loss of actual dollars.  And they keep saying dollars, people's money.  It -- and I want to be very clear.  We're arguing it wasn't money because it wasn't.

It is not legal tender.  Cryptocurrency is not money. It is a virtual currency, and it may become more common in the future, and it may become regulated in the future.  But at this point in time, it is an unregulated commodity, and it should not be counted for a substantial financial hardship.

THE COURT:  Now, according to your sentencing memorandum, what did the defendant do with the cryptocurrency that he got?

MS. SHELDON:  Yes, Your Honor.  So what he did with it primarily, it is believed that he moved it into online gaming.  So basically --

THE COURT:  And did something with it.

MS. SHELDON:  So --

THE COURT:  It had value.

MS. SHELDON:  To play online games, yes, sir.

THE COURT:  Well, but that's the value he chose to use it in.

MS. SHELDON:  Right.  So he chose to convert it -- so he had to convert it to money, so he chose to convert it to money to play online games.  So it can be converted.  I'm not -- defense counsel is not saying it can't be converted. What we're saying is when it was taken, it was not money.

THE COURT:  It's the same thing as if someone stole a stock certificate.

MS. SHELDON:  Defense counsel would disagree because stock certificates actually represent an earnings of a company, and they are regulated by the federal government, and they are insured.

THE COURT:  They're insured?

MS. SHELDON:  They can be, yes, sir.  And cryptocurrency is not.

THE COURT:  What else?  Come on back up.

MS. SHELDON:  That is the only other argument that we had with respect to the sentencing guidelines.

THE COURT:  Yes.

MS. SHELDON:  The only other request that we have is a request for a variance, which would be made in argument --

THE COURT:  Yes.

MS. SHELDON:  -- related to the defendant's age.

THE COURT:  Come on back up, Mr. Urban.

As to the undisputed factual statements and the guideline calculations contained in the presentence report, I adopt those.

As to the controverted factual statements in the guideline application, I adopt the position of the probation officer as stated in the addendum, and therefore I determine that with the current status of the case, your total offense

level now is a 28.  Your criminal history category is a I.

With respect to Case No. 3:23-cr-180, the suggested range of imprisonment is 78 to 97 months.

With respect to Case No. 3- -- excuse me.  Plus there's a potential 24-month consecutive sentence as to Count Fourteen in that case.

With respect to the California case -- that's 3:25-cr-70 -- the suggested supervised release range is one to three years as to Count Fourteen in that case.  And as to the Jacksonville case, 23-cr-180, as to Counts One and Nine, the supervised release range is one to three years.

The restitution that you had indicated you've agreed to is $13,416,275.  The fine range is 25,000 to $250,000.  And as to the four counts, the special assessments are $400, a hundred dollars on each of the counts.

Are there any other victims in the courtroom that wish to make a statement at all?  We had the one witness who says he doesn't wish to make a statement now.

(No response.)

THE COURT:  Okay.  Nobody?

Does anybody know of any reason why we should not now proceed with the imposition of sentence?

Any objections by the government?

MR. CANNIZZARO:  No, Your Honor.

THE COURT:  Any from the defendant?

MS. SHELDON:  No, Your Honor.

THE COURT:  Okay.  I'll listen to what anybody has to say before deciding what to do.

MS. SHELDON:  Do you want to go first?

MR. CANNIZZARO:  Doesn't matter.

MS. SHELDON:  Okay.  Your Honor, we are here today with Mr. Urban acknowledging that he made some very poor decisions as a teenager.

As outlined in the sentencing memo, this conduct started when Mr. Urban was a juvenile, just 15 years old.  In making friends online, he was taught by other co-conspirators, older co-conspirators, how to engage in this behavior.

To Mr. Urban and as a teenager, this was kind of like a game to them because they were sort of playing together, conspiring together, working together to access these systems and transfer the cryptocurrency, which they then used, like teenagers would, to do silly stuff, frankly.  In Mr. Urban's case, to play a bunch of online games.

While he did take out some cash from courier services that will transfer cryptocurrency into money, the vast majority of Mr. Urban's cryptocurrency holdings went actually to Stake.com and -- which is basically a gambling website where you can play online gambling games, not based on skill but just based on -- on luck.

And the vast majority of it is gone, just poof, so

there's nothing really to show for it.  And I think that that, again, plays into the teenage and impulsive mindset of Mr. Urban.

Today he is only 20 years old, but the vast majority of this conduct happened when he was 15, 16, 17, 18 years old.

And as part of his plea agreement, he has agreed to pay restitution for the crimes that occurred when he was a juvenile, acknowledging that what he did was wrong, what -- taking other people's finances and their money and their hopes and their dreams and what they wanted to spend was not appropriate.  He's not going to make any excuses to you about his behavior.

And frankly, you know, he didn't need the money. He's not a poor, destitute person trying to buy basic items. This is a person who -- a child and then a teenager who is playing with his friends online and not really seeing the effect that it's having on the people that they're taking from, because when you're behind a computer, it's really easy to just, you know, look at numbers, at faceless things, and just assume, oh, this is like, you know, play money.

And I would argue that the video game culture and the way that a lot of video games have set up to have online currency sort of reinforces this idea, that online money isn't real money.  And, you know, it's easy for someone who is that young, without the life experience, without the maturity, to

make those decisions.

And for Mr. Urban and his co-conspirators and his friends, it was pretty easy to do. That's why there are so many victims, because it wasn't necessarily difficult for them. Not laying blame on Coinbase or the other organizations, but there were, you know, Fortune 500 companies, AT&T, T-Mobile, etc., who were essentially tricked by a bunch of teenage kids into giving out this information.

And Mr. Urban has significant potential. He's a smart young man. He can do very good things if he puts his mind to -- to do those right things.

In looking at similarly situated cases and some of the codefendants, what we see is, you know, generally huge restitution amounts. And in this case over $3 million in different cryptocurrencies was seized from Mr. Urban. They were just kind of like sitting in an account online, and they were in all different kinds of cryptocurrencies.

And it's our understanding that the government -- I mean, the government did forfeit. They took all -- all of that extra money. And it's our hope that the government will use some of that to reimburse the losses that the victims had, because it's certainly going to take Mr. Urban some time to pay back $13 million as a 20-year-old.

Because he was arrested, you know, almost two years ago -- he was arrested at, like, barely 19 or maybe even 18

years old -- he has never had, like, a real job or really been able to grow in society as an adult male.  You know, he's been a kid.

And we would ask this Court to consider that in fashioning a sentence for him.  Consider when this started he was a tenth grader, and he certainly didn't have the foresight of a grown adult male.  He didn't have the life experience, and he made very poor decisions to steal people's money and be a crypto millionaire on his own couch.

I mean -- I mean, the crazy thing to me is in a 20- or a 19-year-old having access to $13 million, we don't really have anything to show for it.

But with that being said, we're asking this Court to sentence Mr. Urban to a period of a cumulative five years.  We believe that five years is sufficient in this case.  That will make Mr. Urban older when he gets out, hopefully wiser, and a period of supervised release.

We're asking the Court to fashion that sentence by imposing 36 months on the wire fraud and conspiracy to commit wire fraud, then with the consecutive two years of aggravated identity theft on the back of his -- of his case.

So with that, defense counsel cited several other similarly situated defendants, young men or sometimes significantly older men than Mr. Urban.

THE COURT:  I think they were about 33 months.

MS. SHELDON:  Yeah.

THE COURT:  Yes.

MS. SHELDON:  And their conduct is almost identical to Mr. Urban's in this case.  This community of, like, teenage and young adult hackers, they all know each other.  They call themselves a community.  Mr. Urban has talked to almost all of those young men, and they're -- he has, you know, four other codefendants who will be sentenced in their respective jurisdictions.

But we believe that amount of time is sufficient for Mr. Urban to learn his lesson.  We believe that if this Court sentences Mr. Urban to a significant eight, nine, ten-year sentence that the guidelines call for with the aggravated identity theft on the back, it's not going to get the victims their money back any sooner.  And it will really be a detriment to Mr. Urban's growth and development and his ability to be a successful person in society.

I know the Court read all of the letters in support for Mr. Urban and his family, and they are all here.

THE COURT:  And I've read all of the --

MS. SHELDON:  Yeah.

THE COURT:  -- medical material.  And if I'm not mistaken -- I'm just looking through your memo.

Didn't you cite, I believe it was, Justice Kennedy with respect to children and why we don't punish children as

adults, because of the lack of the brain --

MS. SHELDON:  Yes, sir.

THE COURT:  -- capacity?

MS. SHELDON:  Yeah.  Those are from Roper and Graham, just the -- an understanding that children and teenagers are different.  They're different from adults.  They.

Don't have the same capacity to reasonably problem-solve, to foresee the consequences of their actions. Their impulses are lower.  And as I stated before, it's a lot harder for them to fully understand that when they take someone's cryptocurrency, they're hurting those people and their lives.

And in speaking to Mr. Urban's family, he is described as a kind, generous, compassionate young man, and they can't fathom him intentionally hurting somebody.  Like in the example Mr. Cannizzaro provided earlier, they can't imagine that Mr. Urban would go rob someone of $2,000 on the street because he -- they really -- he has empathy, and he wouldn't -- he wouldn't want to hurt someone.

But when it's separated by so many screens, and you don't -- you don't see the people in real life --

THE COURT:  It's impersonal.

MS. SHELDON:  -- it's a lot easier to make those transactions and not feel the harm which you have caused.

But in speaking to Mr. Urban, now he knows the harm

that he caused.  He has copies of the victim impact statements. He read them.  He takes those losses seriously.

And we are hopeful that those victims are able to be reimbursed from the seizure that Mr. Urban had and the seizure of his codefendants, because in addition to the 3 million that was seized from Mr. Urban, there were many millions more seized from the other codefendants, so much so that -- that all of these victims may be made whole.

And one other thing for the Court to consider is these victims were not solely victims of Mr. Urban.  He did not take this cryptocurrency from 60 people by himself.  It was a group effort, and they split the proceeds.  So we are hopeful that they're able to be made whole from the seizures that the FBI has done in collecting much of the cryptocurrency that was taken by these young men.

For all those reasons, we would ask the Court to consider a 36-month sentence, followed by -- and then the 24 months on the aggravated identity theft, for a cumulative five-year sentence, as we believe it is sufficient but not greater than necessary for the Court to punish Mr. Urban for his conduct, to ensure that he does not continue to do this in the future.

In the supervised release conditions, we're asking the Court to order some kind of gambling therapy or treatment related to that just to make sure that that doesn't become a

problem for him in the future.

There's no indication that drugs or alcohol have been a problem for Mr. Urban, and as stated before, he's a very intelligent young man.  So we expect that he will be able to do great things in the future.

THE COURT:  Thank you.

Do you wish to be heard, Mr. Urban?

THE DEFENDANT:  Yes, sir.  Thank you.

I'd like to apologize to the victims of my crime, to the Court, and to my family.  I know what I did was wrong.  I stole from people, and there's no excuse.  There's nothing I can say.  There's no justification that will make it right.

I'm going to do my best to make sure that I try and make everyone happy who was in it, if there's any way I can do that, by working hard and paying back the money that I took.

And no matter how much time I'm sentenced to, I'm focusing and I'm committed to bettering myself every day, and that whenever I do get out, I'm going to make sure that I'm a positive influence and contribution to society by helping people and making sure that they are not being stolen from by people who are acting as I once did, and possibly preventing others from making the same mistakes that I have.

Thank you.

THE COURT:  Thank you.

What says the government?

MR. CANNIZZARO:  Thank you, Your Honor.

Your Honor, it is the hope of the United States that the money that was seized from Mr. Urban's computer that is listed in the plea agreement, when you order it forfeited today, our next step will be starting the process so that cryptocurrency can be sold off and then get back in the hands of the victims.

I did a little bit of math on that.  It's a little bit under $5 million.  So the cryptocurrency that was found that was seized in the wallets that were on Mr. Urban's computer, plus some of the additional things in the residence, all that together is a little bit under $5 million.

So our hope is once we finish up here today, the process will happen -- and I'm not part of that process, but the process will happen where some of that money, or all of that money, rather, will be sold off, converted into dollars, and then get back in the hands of the victims.

So that's $5 million.  We're talking about $13 million in restitution.  So it will be, I imagine, some sort of pro-rata share so that everybody will be able to get some of their money back.

But, you know, it's still going to leave Mr. Urban with about $8 million to pay back, which is a substantial amount of money, and the guidelines account for that.  The guidelines account for the loss, the type of loss, the type of

amount, the enhancement because of the ten or more victims.  We have 60 victims here, and quite honestly, there's more victims that are out there.

When the FBI searched Mr. Urban's computer, there were a variety of other passwords and emails and accounts that we just -- they just could not put it all together, but there are definitely other victims out there.  I think the FBI had at least 120 other names that potentially could have been victimized.

Mr. Urban, from the very beginning, though, wanted to plead guilty.  The reason why it kind of took us so long -- I think almost 600 days -- was between trying to craft a plea agreement that made sense to account for the California indictment, which then we had to Rule 20 over here, and trying to get the restitution numbers as best as we can.

In reading the victim impact statements, I'm sure Your Honor's aware of the, "Well, if I had the money now, it would be more money," or less money.  So there's a -- there's a lot, you know, when it comes to that amount.  But the United States feels that -- that, you know, we did the best that they could, the FBI, in articulating the loss amount as the $13 million.

Mr. Urban is young.  Specifically, the charges that he was indicted on, I started the conspiracy date when he turned 18.  That was just the date that I made up because I

wanted to capture when he became an adult.  But Ms. Sheldon is -- the defense is right.  His conduct occurred way before that.

So the conspiracy that he pled guilty to, the wire fraud counts, all those reflected when he was an adult.  But there's no -- there's no doubt that he was a minor when he was engaging in this.  And that's why you can see the difference in the mandatory restitution versus the voluntary restitution.  Mr. Urban agreed to pay that.  So I do believe him when he says he wants to make things right, and I do believe that's something you should consider.

The nature of the crime.  We live in a society today that you can sit behind a screen and you can write the most horrible things to people that will have a significant impact on their lives.  We have to deal constantly with online threats, online predators that are sitting in darkness -- we will never be able to figure out who they are -- that are saying horrible things and inflicting serious -- inflicting serious psychological damage.

And what Mr. Urban did was no different.  He sat, I think -- maybe he stood, I don't know.  He was behind a computer, and he figured out a way to break into these systems by scamming them, some of the oldest scams in the book, for greed.  Yeah, Bitcoin is new.  Crypto is new.  Online currencies, kind of new, but for greed.

And, yeah, he wasn't the bully at the school lunch yard or the school playground taking people's lunch money.  He was the bully online, the bully that people feared in all those victim impact statements.  And, yeah, you're right.  It was, you know, less personal.  The victims have no idea what Mr. Urban looks like.  Mr. Urban has no idea what the victims look like.  It is impersonal.

But if you read those victim impact statements, which I know you did, you saw how personal it was, how people are waking up in the middle of the night because their privacy was intruded.

Today we carry our entire lives with us on our phones.  Whether that's good or not, that's the way it is.  Our most prized possessions of our photos of our family, our bank account information, everything that is personal to us.  It's far easier to just, you know, not do anything for an hour than to not have your phone for an hour.  That is how much we are attached to the technology.

And that technology is evolving way faster than we are.  And Mr. Urban found a way to hack into that, and that's what he did.  He was a hacker.  And, yes, he was a minor when he started doing this, but he knew what he was doing.

He knew how to steal people's passwords.  He knew how to use those passwords and then get other passwords attached to his email accounts and then go into those accounts and then

drain the money of the victims that you have in front of you today and then use that money.  This wasn't just a one-click operation.  This took time.

And I do argue that it was sophisticated, so much so that we now have -- you know, we thought two-factor authentication would be the way to go.  You know, you say who you say you are.  Well, let me text your phone.  Type in the password.  Well, they figured out a way to beat that.  Some of the most complicated security measures were in place.  They beat that.  They beat the two-factor authentication.

And they were able to find out who those victims were by fishing in those companies.  And once they found out those victims had Coinbase accounts and crypto accounts, then they went into their accounts and stole their money.

So this wasn't just some sort of, you know, fly-by-night operation.  This took time.  And as of today, they are still investigating Mr. Urban's co-conspirators, his contacts.  It's been in the news.  It will continue to be in the news.  This is not a one-off.  This is a substantial problem.  Deterrence is at the forefront of what I think the sentence should be.

And I looked at those other sentences.  Some of them were 18 months.  Some of them were up to 60 months.  I don't know all the facts of the -- of the -- of all those defendants, but I know the facts of this case.

The FBI got lucky when we served the search warrant on Mr. Urban's residence in Palm Coast. They were lucky because when they entered the house, Mr. Urban was downloading on his computer some sort of enhanced security software update, so the computer was still running. He couldn't turn it off.

So because of that, we were able to get on the computer right away, and we were able to see all the wallets, the crypto wallets, that he took from the victims. And that's why he was charged here in the Middle District of Florida, because we had the artifacts on his computer. On his computer. There was nobody else there. It was him. And he admitted to it, so he needs to be held accountable, obviously. He admitted to that.

So the United States feels that the guidelines are appropriate, low end of the guidelines, 78 months, plus the 24 months for the aggravated identity theft.

And I believe what -- I read the defense's sentencing memorandum. I don't think Mr. Urban is an evil person. He's a -- I think he has the potential. I mean, I read the commendation he got from the Longwood sheriff's department for saving his family. I mean, he has it in him.

But it was this greed and this online culture, whatever you want to call it, and this desire to -- to hack and to steal.

So the United States is asking for a guideline

sentence.

Thank you.

THE COURT:  Anything else from the defendant?

MS. SHELDON:  Nothing further, Your Honor.

THE COURT:  Okay.  Let me just ask a question.  I had referenced this a minute ago.

There is a three-page document that I was handed today that's entitled Victim and Restitution List.  The list starts off with Victim Nos. 1 through 29.

Were the victim -- have you been given a copy of that?

MS. SHELDON:  Your Honor, I do not have a hard copy, but I was emailed --

THE COURT:  Okay.

MS. SHELDON:  -- a digital copy.

THE COURT:  So you've seen it.

MS. SHELDON:  Yes, sir.

THE COURT:  Okay.  The first page begins with Victim No. 1, a M.G. -- I believe I read part of his victim impact statement -- and that runs onto page 2 and ends with Victim No. 29.

Are those the victims in the Jacksonville case?

MR. CANNIZZARO:  Your Honor, so let me just look at it.  What I -- what I basically did, before I sent this to anybody, is I went over each restitution amount and victim

number, so 1 through -- so Victim 1, if you look on page 7 of the plea agreement, 287,603, that's Victim 1.

Do you see that?

THE COURT:  Yes.

MR. CANNIZZARO:  Okay.  So Victim 29 -- that is correct.

THE COURT:  Okay.  So those are from the Jacksonville case.

MR. CANNIZZARO:  Correct.

THE COURT:  Then beginning on page 2, it's marked Individual 2 through 15 and then on page 3, Individual 16 through 31.

Is that from the California case?

MR. CANNIZZARO:  That is correct, Your Honor.

THE COURT:  Okay.

MR. CANNIZZARO:  And I don't -- I don't have the same -- I printed it out a little bit different than you.  But anything where you see individual --

THE COURT:  That's California.

MR. CANNIZZARO:  -- that's the Calif- -- that was our only -- yes.

THE COURT:  Okay.  Because I intend to have that put in with the judgment, so that's how it would be known as.

MR. CANNIZZARO:  I think that's the best --

THE COURT:  Okay.

MR. CANNIZZARO:  -- way to do it, Your Honor.

THE COURT:  Good enough.  Okay.  Yep.  I'm with you.

Okay.  Come on back up, Mr. Urban, please.

Now, if my memory serves me correct, I think that -- and I'll go into this a little bit more later to explain.  I think he's been in custody now since January of '24.

MS. SHELDON:  Yes, Your Honor.

THE COURT:  So it's been 500 and something days?

MS. SHELDON:  I calculated it as 588 days.

THE COURT:  Okay.  And I'll explain the reason for going into that in just a second.

I've asked the parties why judgment should not now be pronounced and no cause having been shown, I've listened to the statements that the parties and the defendant has made.  I've read into the record what I have all reviewed, in addition to the presentence report and the sentencing statement and all of the letters from the defendant.

Pursuant to Title 18 of the United States Code, Sections 3551 and 3553, it is the judgment of this Court that the defendant, Noah Michael Urban, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 120 months.  That's ten years.

The term will consist of 96 months as to Counts One and Nine in Case No. 3:23-cr-180, which is the Jacksonville case, and Count One of Case No. 3:25-cr-70, which is the

California case, all of those terms to run concurrently, and a 24-month term as to Count Fourteen in the Jacksonville case, 3:23-cr-180, to run consecutive to the other counts, the 96-month counts.

Upon release from imprisonment, the defendant will serve a three-year period of supervised release.  The term will consist of three years as to Counts One and Nine in case 3:23-cr [verbatim] -- that's the Jacksonville case -- and Count One in Case No. 3:25-cr-70, the California case, and a one-year term as to Count One in Case No. 3:25-cr-70, which is the California case.  And those terms are to run concurrently with each other.

While on supervised release, the defendant will comply with the mandatory and standard conditions adopted by the Court in the Middle District of Florida, which can be found in Section 5D1.3(a) and (c) of the United States Sentencing Guidelines.

In addition, the defendant will comply with the following special conditions:

No. 1, you will submit to a search of your person, your residence, your place of business, any storage units under your control, computers, or vehicles conducted by the United States probation officer at a reasonable time and in a reasonable manner, based upon a reasonable suspicion of contraband or evidence of a violation of the conditions of

release.

And you shall inform other residents that the premises may be subject to this search pursuant to this condition.  A failure to submit to the search may be grounds for revocation.

The second special condition is you will be prohibited from incurring new credit charges, opening additional lines of credit, or obligating yourself for any major purchases without approval of your probation officer.

Third, you'll provide your probation officer access to any requested financial information.

The underlying charge is a qualifying felony.  You'll cooperate with your probation officer in the collection of a DNA sample.

The mandatory drug testing requirements of the Violent Crime Control Act are hereby suspended.

You will make restitution in the amount of $13,416,275.  This restitution obligation shall be payable to the Clerk of the U.S. District Court for distribution to the victims.

While you're in prison, if you do not have a UNICOR job, you'll pay $25 quarterly.  If you do have a UNICOR job, you will pay 50 percent of your monthly earnings.

Upon release from custody, you shall make restitution in the amount of $100 a month.  At any time during the course

of your post-release supervision, the victims, the government, or you can notify the Court of a material change in your ability to pay, and the Court may adjust the payment schedule accordingly.

Now, this will be attached to the judgment.  The restitution is to be as follows:

To M.G., Victim 1 -- and this is in the Jacksonville case -- $287,603.

To G.M., $21,952.

To Victim 3, J.H., $37,742.

To S.M., $106,075.  That's Victim No. 4.

Victim No. 5, C.R., $367,349.

No. 6, Z.H., $3,448.

No. 7, S.A., $9,038.

Victim No. 8, S.C., $3,443.

No. 9, K.J., $8,899.

Victim No. 10, G.T., $10,686.

Victim 11, L.A., $9,794.

Victim No. 12, A.H., $12,494.

Victim 13, D.A., $99,423.

Victim 14, R.K., $7,373.

Victim No. 15, L.Z., $80,539.

Victim 16, J.S., $32,435.

Victim No. 17, S.S., $30,981.

Victim No. 18, E.G., $19,367.

No. 19, D.J., $326,431.

Victim No. 20, G.H., $52,293.

No. 21, S.T., $102,615.

Victim No. 22, B.D., $453,431.

Victim No. 21 [verbatim], B.M., $150,000.

Victim 24, J.P., $84,246.

Victim 25, L.M., 520,000.

Victim 26, R.B., $15,333.

Victim No. 27, N.A., $517,177.

Victim 28, R.K., $37,041.

Victim No. 29, P.L., $3,584,787.

As to the California case, that's the '25 case, Individual No. 2, E.V., $266,988.

Individual 3, J.M., $571,413.

Individual No. 4, D.C., $95,606.

Victim No. 5, C.C., $131,290.

Individual No. 6, R.G., $60,010.

Individual No. 7, R.L., $199,456.

Individual No. 8, A.F., $199,116.

Individual No. 9, M.E., $413,004.

Individual No. 10, R.K., $19,573.

Victim No. 11, C.T., $40,411.

Victim No. 12, R.B., $9,179.

Victim No. 13, G.K., $16,911.

Victim -- excuse me, Individual 14, A.M., $32,302.

Victim No. 15, S.T., $152,205.

Individual 16, A.R., $35,647.

Individual 17, M.L., $20,093.

Individual 18, Y.L., $11,842.

Individual No. 19, J.L., $195,768.

Individual No. 20, D.H., $129,586.

Individual 21, D.S., $5,381.

Individual No. 22, M.L., $1,668,034.

Individual No. 23, J.G., 57,800.

Individual 24, N.C., $34,861.

Victim -- Individual No. 25, J.B., $207,874.

Individual No. 26, T.R., $7,094.

Individual 27, L.L., $17,135.

Individual 28, F.S., $97,217.

Individual 29, A.F., $4,010.

Individual No. 30, S.B., $574,958.

Individual No. 31, J.P., $1,151,516, which totals $13,418,275.

And that will be attached to the judgment.

I find that the defendant currently does not have the ability to pay interest on the restitution, and I waive the interest requirements on restitution.

Based on the defendant's current financial status, the Court waives the imposition of any fine.

As to forfeitures, it's ordered that the defendant

will forfeiture the -- to the United States the following assets:

1,306,285.53 Dai seized from the wallet ending in 38D1f9a.

800.483 Ethereum (ETH) seized from a wallet ending in 38D1f9a.

43.5175994 Monero (XMR) seized from a wallet ending in 12rT5sN.

9.0215721 Ethereum (ETH) seized from wallet ending in b223Cdf.

0.0232488 Bitcoin (BTC) seized from wallet ending in hamtguw.

8,998.10 Dai seized from wallet ending in 8A55De3.

1.20291 Ethereum (ETH) seized from wallet ending in 8A55De3.

936.31358 Monero (XMR) seized from wallet ending in 9CU4qG8.

.085362 Bitcoins (BTC) seized from wallet ending in 69mzhmz.

56,121.298 Ripple (XRP) seized from wallet ending in yswM6ew.

$27,072 in U.S. currency seized from the residence at 1 Edge Lane, Palm Coast, Florida, and miscellaneous jewelry and six watches.

It's further ordered that the defendant will

immediately pay the United States a special assessment in the amount of $400.

I've considered the advisory sentencing guidelines and all of the factors set forth in Title 18 of the United States Code, Section 3553(a)(1) through (7), and I find that the sentence imposed is sufficient but not greater than necessary to comply with the statutory purposes of sentencing.

With respect to the sentencing and what I had said previously, counting the time in the Baker County Jail, I had, in looking at this case, a thought about, rather than varying downward, varying upward in the case.

But then when I realized the defendant has been housed in a county jail rather than a federal prison for almost two years -- as you said, it was 588 something days -- I decided that a sentence in the guideline range was more appropriate in this case.

With respect to -- do you want to be housed at an institution as close to Central Florida as possible or --

MS. SHELDON:  Your Honor, he's requesting Coleman if possible.

THE COURT:  Coleman?  Okay.  I'll make that recommendation to the Bureau of Prisons.

And I'll also recommend to the Bureau of Prisons that the defendant, if there is such a program involving gambling therapy, that he take that now rather than to wait until he's

out on supervised release.

I've accepted defendant's plea agreement because I'm satisfied that the agreement adequately represents the seriousness of the actual offense behavior and that accepting the plea agreement will not undermine the statutory purposes of sentencing.

Under the current plea agreement the defendant entered a plea of guilty to Counts One, Nine, and Fourteen of the indictment here in Jacksonville, Case No. 3:23-cr-180, and Count One of an indictment in California, 3:25-cr-70, in return for a dismissal of Counts Two through Eight and Counts Ten through Thirteen in the Jacksonville case, 3:23-cr-180, and Count Two and Three in the California case, 3:25-cr-70.

Is the government moving for the dismissal of those counts?

MR. CANNIZZARO:  Yes, Your Honor, we are so moving.

THE COURT:  It's ordered that Counts Two through Eight and Count Ten through Thirteen in the Jacksonville case, 3:23-cr-180, and Counts Two and Three in the California case, 3:25-cr-70, are hereby dismissed.

Now, in your plea agreement you gave up your right to appeal unless one of four things happened.  That's between you and your attorney to decide whether they have been reached or not.

My obligation is to advise you that under the law you

have 14 days from today to take an appeal.  If you don't appeal within the 14 days, you lose your right to appeal.

Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And I express no opinion about the plea agreement and what you've already waived.

Of course, the government has the right to appeal under the same circumstances.

Do you understand that, the 14-day?

He's asking you a question.

(Defense attorney conferring with defendant.)

THE DEFENDANT:  Yes, sir.

THE COURT:  You do -- you do understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  My courtroom deputy said that with respect to the forfeiture of the cash, the U.S. currency, I said it was 27,072.  It should be $27,702.

Now, if you take an appeal -- the public defender was appointed to represent you in this case, and if you take an appeal, you would be entitled to have an attorney at no cost or obligation on your part, and they'll continue to represent you in this case.

Now, the Court having pronounced sentence, does counsel for the defendant or the government have any objections to the sentence other than what's previously been stated in the

record?

MR. CANNIZZARO:  No objections by the United States, Your Honor.

THE COURT:  Any from the defendant?

MS. SHELDON:  Your Honor, we would just -- I know you said we don't need to, but we would renew our objection as to the substantial hardship --

THE COURT:  Yes.

MS. SHELDON:  -- enhancement.

THE COURT:  Well, I -- that's why I read those into the record.  I mean, more than just losing the ability to have that money, the people still have physical problems, mental problems, emotional problems.  That's what we're talking about.

MS. SHELDON:  Yes, Your Honor.

We would also object that the Court did not adequately consider the defendant's young age in sentencing --

THE COURT:  Oh, I --

MS. SHELDON:  -- to the high end of the guidelines range.

THE COURT:  Believe me, the only difference with respect to the age of the defendant, he's probably smarter than most people ever were in their life.

Like you said, it took some way to -- as the government said, to break into a sophisticated system.  And I guess no matter what systems people come up with, there's going

to be someone that's going to figure out a way to get through it.  That's just the way it is.  That's why some people never put anything in their phone other than phone numbers, for that very reason.

Of course, once you do that and once somebody gets into it, it's in the public domain.  That's just the way life is today.

Good luck to you, Mr. Urban.  I'm just going to wait so I can sign the paperwork.

(The proceedings were concluded at 11:31 a.m.

- - -

CERTIFICATE OF OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT )

MIDDLE DISTRICT OF FLORIDA    )

I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated therein.

DATED this 22nd day of August, 2025.

s/Shelli Kozachenko_____
Shelli Kozachenko, RPR, CRR, CRC
Official Court Reporter