## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA**

**v.**                                        **Case No. 3:23-cr-180-HES-SJH**
                                                              **3:25-cr-70-HES-PDB**

**NOAH MICHAEL URBAN**

_____/

### DEFENDANT'S SENTENCING MEMORANDUM

"Hackers don't need names or proximity—just opportunity."[1]

#### Case History

The activity that gave rise to these indictments began during the shutdown related to the COVID-19 pandemic in 2020. Noah Urban was 15 years old, a kid with no criminal record ██████████████████████████████████████ ████████████████████████████████████.

He was 17, still a juvenile without a criminal record, when the FBI began issuing subpoenas to investigate him, and only 18, barely an adult, when the FBI came to realize his role in the scheme. At 19, he was finally indicted and arrested. Mr. Urban is now 20 years old and facing serious consequences for the conduct that began when he was a child.

Mr. Urban was arrested on January 10th, 2024, while driving into his neighborhood. He had no idea why he was being arrested. Unbeknownst to

---

[1] Robert Mueller, Former Director, FBI

him, a grand jury in the Middle District of Florida issued a 14 count Indictment on December 20, 2023, for actions that occurred years before. Mr. Urban was aware of the investigation into his online behavior, but he was expecting notice of the warrant and an opportunity to turn himself into custody.

This case has been pending sentencing for an extended period so counsel could resolve both this case and the related case from the Central District of California via Rule 20 of the Federal Rules of Criminal Procedure. The process for getting the California case to Florida was laborious.  When Mr. Urban finally appears before this court, he will have been in the Bradford County jail for 588 days. [2]

## History and Characteristics of Noah Urban

### Family and Childhood

Mr. Urban was born in South Carolina but grew up and has spent his young life in and around Central Florida. ████████████████████████████

████████  By his family's account, he was a loving, sensitive child who cared about those less fortunate, would get upset if his family didn't tip restaurant workers enough, and cherished time with his extended family.[3]  He had dreams of becoming

---

[2] From January 10, 2024, to August 20, 2025.
[3] Letters from family are attached as Exhibit 1.  Photos are attached as Exhibit 2.

2

a lawyer; then, after winning a citizen hero award from local police when he was 10, decided he wanted to be a police officer.[4]

When Mr. Urban was 2, his parents divorced, and he spent most of his childhood and teen years going back and forth between their homes in different towns. By any definition of co-parenting, they failed. The divorce was contentious and adversarial, and that adversarial relationship persists today. They discredit each other. They have diametrically opposite methods and views of parenting. At his mother's home, there were rules and structure; at his father's, there was little, if any. This conflict had a profound effect on their son, who learned early how to play one side against the other, depending on what he wanted at the time. If he wanted more freedom, he went to his father's. If he wanted structure, he went to his mother's. Over the years, his worldview was shaped by their constant back and forth. To him, rules became arbitrary suggestions to be followed when convenient or comfortable instead of a consistent guidepost.

███████████████████████

████████████████████████████████████

████████████████████████████████████

---

[4] A copy of the Longwood mayor's proclamation is attached as Exhibit 3.





████████████████████████████████████████

███████████████████████████████████

    █████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

Once the pandemic began, Mr. Urban withdrew from Lake Mary High School and was home schooled.  He received his diploma from Florida Virtual School in 2022.

One cannot overstate how young Mr. Urban is and was during the commission of his crimes. Brain research has consistently shown the front of the brain, the prefrontal cortex, is one of the last areas of the brain to develop and is not fully developed until a person is in their 20s. It is the part of the brain responsible for, among other things, controlling impulses and anticipating consequences. As the American Medical Association and the American Academy of Child and Adolescent Psychiatry told the United States Supreme Court, "The adolescent's mind works differently from ours. Parents

---

█ ████████████████████████████████

know it. This Court has said it. Legislatures all over the world have presumed it for decades or more. … Scientists have found that adolescents as a group, even at later stages of adolescence, are more likely than adults to engage in risky, impulsive, and sensation-seeking behavior."[9]

The Supreme Court has consistently found this research instructive in its landmark rulings in *Roper vs. Simmons*, 543 U.S. 551 (2005), rendering unconstitutional the death penalty for juveniles; *Graham vs. Florida,* 560 U.S. 48 (2010), holding that it is unconstitutional to impose life without parole sentences on juveniles in non-homicides; and *Miller vs. Alabama*, 567 U.S. 460 (2012), holding that mandatory life-without-parole sentences for juveniles are always unconstitutional. As Justice Anthony Kennedy wrote in *Roper* and reiterated in *Graham,* "As compared to adults, juveniles have a lack of maturity and an underdeveloped sense of responsibility; they are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; and their characters are not as well formed." *Graham*, at 68 (citing *Roper*, at 569-570). This, he wrote in *Graham*, "often results in impetuous and ill-considered actions and decisions." *Graham*, at 72.

---

[9] Brief for the American Medical Association and the American Academy of Child and Adolescent Psychiatry as Amici Curiae in Support of Neither Party, filed in *Graham v. State of Florida*, Case number 08-7412, July 23, 2009.

Although Mr. Urban is not facing the death penalty or life imprisonment (a death in prison sentence), he is still very young today, and was a juvenile at the time that many of these offenses occurred.

## Nature and Circumstances of the Offense

### Cryptocurrency

Cryptocurrencies are a fully digital medium of exchanges. Despite "currency" being a part of the nomenclature of cryptocurrency, they are not technically currency in the United States, because the basic definition of currency as defined by US Department of Treasury requires that it [i] is designated as legal tender, that [ii] circulates, and [iii] is customarily used and accepted as a medium of exchange in the country of issuance. Most, if not all cryptocurrencies are designated as "virtual currency" by the US Department of the Treasury because they do not have legal tender status. All cryptocurrencies are not necessarily "created" or "maintained" by the same process, nor are they all created equal. For illustrative purposes only, this will explain the process of "mining" Bitcoin.

Imagine an almost endless ledger of transactions that is completely blank. Every blank space or "block" on the ledger states that a certain number of coins will be given to whoever accurately records the previous entries on the

ledger or "blocks" while simultaneously guessing a new computer-generated randomized number.

Bitcoin exists on a "blockchain", an encrypted digital ledger that records all Bitcoin that has been awarded and all transactions made with Bitcoin. A new block is added to the Bitcoin ledger approximately every ten minutes. This new "block" is awarded to the person or organization that correctly guesses a completely randomized lottery number while sequentially copying the transactions preceding it on the ledger. There is approximately, a one in a trillion chance of guessing the correct number.

The blockchain ledger is maintained by over 20,000 decentralized computers. Each computer that connects to the ledger is called a "node". Each "node" must approve any new block added to the ledger. The blockchain directly connects the nodes to each other, and they are continually interpreting and decoding parts of the blockchain to confirm the accuracy of the transactions of Bitcoin and to verify the amount of Bitcoin in circulation. If nodes do not approve the new block being added for correctly guessing the number (because it is missing the sequencing transactional information from the previous blocks), then it is not added to the blockchain, and no Bitcoin is awarded. No one can go back in time and tamper with the blocks already on

the ledger-chain because then they would not match the sequential records maintained by all the other nodes. Approving an "out of sequence" block would essentially "break the chain" and would be an obvious rejection. The blockchain is an open-source fully public system that anyone could connect to. No one person or even a large group of people can control or manipulate the ledger. It has been specifically designed to avoid all centralized regulatory authority.



[10]

---

[10]Gabriel Rodriguez Cruz, "What Is Blockchain", Money Group LLC, June 22, 2022. Available at https://money.com/what-is-blockchain/

Every time a piece of the blockchain is decoded (by guessing a random number and capturing the prior transactions) more bitcoin is "minted" as an "award" to the computer that completed the decoding. Each block of Bitcoin added to the blockchain ledger represents not only new bitcoin added, but also contains information about the transactions of Bitcoin that came before it.

By design, the decoding of the blockchain was very easy at first because there was very little Bitcoin in circulation, and very few prior transactions to record. In addition to being easier to do, the blockchain awarded more Bitcoin per decoding. The amount of Bitcoin awarded for every added block has reduced by half every four years, while odds of guessing the correct number have become exponentially harder.



[11] Conor Mulcahy," In Less than 3 years, The Bitcoin Price Will Change Forever?" *Bitcoin Magazine*. April 23, 2025. Available at https://bitcoinmagazine.com/markets/in-less-than-3-years-bitcoin-price-will-

Now, as the ledger has gotten larger and more complex, decoding is very time consuming, requiring many supercomputers and huge amounts of energy. Most Bitcoin mining operations utilize thousands or hundreds of thousands of supercomputers putting out literally millions of guesses per minute. Furthermore, the reward for Bitcoin earned has decreased exponentially over time, giving very little Bitcoin as an award per each complete decoding block added. This entire process is referred to as to the "mining" of Bitcoin. Since Bitcoin was invented in 2009, 50 Bitcoins were awarded for each decoding, but now only 1.5625 Bitcoin is rewarded for each decoding, and soon, no more Bitcoin will be rewarded per decoding.

The history of Bitcoin is shrouded in speculation because no one knows who created the computer program. Satoshi Nakamoto is the name used by the presumed pseudonymous person or persons who developed bitcoin, authored the bitcoin white paper, and created and deployed bitcoin's original reference implementation.

Bitcoin, and cryptocurrencies generally, are not tied to any real-world government or item for a measure of value; the value of most cryptocurrencies is created by the emotional attachment, scarcity, and market speculation.

---

change-forever

Bitcoin is basically a "digital prize" for guessing a number at random. While it may seem reasonable to analogize cryptocurrencies to other commodities that are literally mined such as copper, gold, or diamonds, this analogy is inadequate. In addition to attachment, scarcity, and speculation, traditional commodities also have intrinsic value. Copper, for example is used for wires and other components in electronics. Diamonds are commonly associated with their use in jewelry (emotional or cultural attachment) but are also necessary in industry for drill bits, saws, and high-end laboratory optical devices. Gold also has extrinsic value in jewelry and as a backing to certain currencies. Cryptocurrencies do not have any intrinsic value beyond their collectability.

Cryptocurrencies have more in common with collectibles such as baseball cards than they do with precious metals or currency. Like cryptocurrencies, baseball cards are valued based on the emotional or cultural attachment, the scarcity of the card, and market speculation. There is no intrinsic value to baseball cards just as there is no intrinsic value to cryptocurrency. In addition, cryptocurrency, like baseball cards, are traded between collectors or can be traded or sold for actual currency. Baseball cards and cryptocurrencies are held in large quantities for purposes of speculation, by collectors hoping to take advantage of wildly fluctuating markets to hopefully make large returns on

12

their investment. Both baseball cards and cryptocurrencies are not commonly accepted mediums of exchange. When cryptocurrency is collected and held in a "digital wallet," it is akin to a personal collector holding a box of baseball cards. The value is completely dependent on the mood and attitude of collectors on any given day. For this reason, any open-source cryptocurrency could instantly become valueless based on the whims of the speculators, or in the event of a blockchain failure.

Today, most people who have Bitcoin are not mining it themselves, but instead they are buying Bitcoin that has already been mined from early miners or organizations with massive quantities of super computers.

### Cryptocurrency and Video Game Currency

According to Pew Research, 85% of teenagers play video games with up to 41% of teens considering themselves to be "gamers".[12] Many of the most popular platforms have taken in-game purchases a step further and created their own digital currency for use solely within their game. For example, V-Bucks are the currency of Fortnite, Robux are the virtual currency for Roblox, Minecoins for Minecraft, Riot Points are the currency for League of Legends, Valorant and Legends of Runeterra. These virtual currencies are purchased

---

[12] Jeffrey Gottfried and Olivia Sidoti. "Teens and Video Games Today". PEW RESEARCH CENTER. May 9, 2024. Available at https://www.pewresearch.org/internet/2024/05/09/teens-and-video-games-today/

with actual currency, and there are exchange rates for them. Rates fluctuate, but as of July 2025, $10 USD is equal to around 800 Robux, 1,000 V-Bucks, 1,720 Minecoins, and 1380 Riot Points. These digital currencies allow players to purchase "in-game" items such as special outfits for their characters, virtual accessories, or to unlock new levels. The virtual currencies are not interchangeable- and cannot be exchanged back for money. One cannot convert Robux into V-bucks or Minecoins, and the currencies can only be used for in-game "virtual' purchases, not to purchase items in real life.

Because virtual currency values are so different from the value of dollars, the use of these currencies has created a confusing, and perhaps concerning, environment for children and teenagers learning how to manage real money. Gaming platforms directly encourage excessive purchasing, and they often present items for a "limited time" only or "flash sales", where virtual goods are sold as part of a random pack. In addition to being a headache for parents with kids begging for the newest "virtual accessories", experts warn that this  virtual currency can be addicting, much like  gambling and creates dopamine rushes similar to drug or alcohol use.[13] In-game purchases are

---

[13] Jamie Walters, "Constant Craving: How Digital Media Turned Us All Into Dopamine Addicts." *The Guardian.* August 22, 2021. Available at https://www.theguardian.com/global/2021/aug/22/how-digital-media-turned-us-all-into-dopamine-addicts-and-what-we-can-do-to-break-the-cycle

driven by deep psychological triggers, particularly the desire for achievement and social status.[14] They are not great for young gamers who do not understand the addictive nature and financial implications like an adult would. Generally, the more in-game purchases a gamer makes, the more other children look up to that gamer as successful or important. For a child who has difficulty making friends in real life, the temptation to become an important gamer or someone to be sought after as a team member cannot be overstated.

This photographs below represent what a gamer would see when looking to make and "in-game" purchase.



---

[14] "Insert More Coins: The Psychology Behind Micro Transactions" Touro University Worldwide. PSYCHOLOGY. February 25, 2016. Available at https://www.tuw.edu/psychology/psychology-behind-microtransactions/#:~:text=Another%20powerful%20tactic%20is%20loss,stay%20ahead%20in%20the%20game.



### The Conspiracy

At just 15 years old, Noah Urban met a group of other teenage boys while playing online games like Minecraft and Call of Duty. They would use an application called "Discord" to create group chats to talk to each other about the online games and life in general. Noah played hours upon hours of video games. Initially, during the beginning of the pandemic, he was at home doing "virtual learning" and not spending time with peers in real life. This pattern of spending hours upon hours online every day, played out for several years. Around this time, he stopped doing shared custody between his mother and father and began living solely with Robert Urban. While at his dad's house, Noah had virtually unlimited access to the internet and online gaming. He

16

would play video games for 8+ hours every day. He was attempting to build a following for his gaming and monetize his efforts. Through these online groups on Discord, Noah was introduced to the idea of "sim-swapping" by other gamers in his online friend group known as the "Community".

The group's main goal was to work to gain access to high value crypto-currency wallets. They would target certain companies like AT&T, T-Mobile, Comcast, MailChimp, and Coinbase by pretending to be employees of the companies and calling in to their respective customer service or IT departments. They would pretend to need help or assistance and naïve and unsuspecting employees would give them full access to the companies' databases. The boys used this information to develop a target list of people they thought had extensive crypto-currency holdings. Noah and his co-conspirators would research the employees they were attempting to trick and present believable stories to gain access to the databases. The employees at the companies were fooled by these teenagers, hook, line, and sinker.

Once inside the databases, Noah and his co-conspirators would take over the cell phones of their high value target by swapping their sim[15] card with one

---

[15] A SIM card, which stands for Subscriber Identity Module, at its inception it was a small, removable smart card that identifies a user to a mobile network. It stores crucial information like your phone number, subscription details, and security information, enabling your device to connect to a cellular network and use services like calls, texts, and mobile data. Now, most cell phones have virtual SIM cards, so they can

in a "burner" phone. SIM swapping is where a person tricks a mobile carrier into transferring a victim's phone number to a SIM card under the impersonator's control. This allows the person to intercept calls, texts, and other forms of two-factor authentication sent to the target's number, gaining access to their online accounts and cryptocurrency wallets. Once inside the target's cell phone, Noah and his co-conspirators would empty the crypto wallet by transferring crypto to their own wallet through a "scrubbing" application, which helps to move the crypto through foreign markets, making their final endpoint very difficult to trace. The target may notice an interruption in his or her cell phone service, and by the time he or she reached a customer service representative to get their phone service restored, their crypto-currency wallet had been cleaned out. After the boys scrubbed the cryptocurrency, they would split the tokens into portions based on the type of work done by each participant. The entire operation was done from the comfort of their own computer chair at each of their respective houses. These boys did not know each other in real life. They lived all over the country and even internationally.

All the codefendants were teenage boys when this conspiracy began and many of them still lived at home with their parents. They had no real need for

---

be transferred without ever having physical control over the phone.

cryptocurrency. This crypto swapping was like a game to them. Taking cryptocurrency was basically like stealing video game currency. In one of their targets, they stole video game currency from Riot Games. These thefts allowed them to have silly online luxuries without ever leaving the house to work, and it gave them online credibility and notoriety. The defendants rationalized their actions. They specifically targeted people who had significant crypto-currency holdings. They assumed, it was not like they were stealing "real money" that people were using for food and shelter. The "targets" were speculators experimenting with a very volatile token that the SEC could not legally regulate.

Mr. Urban personally, utilized almost all the cryptocurrency he acquired to play online gambling games at "stake.com", an international gaming website out of Cypress, which is an online casino and sports betting site. Mr. Urban wasn't even old enough to gamble legally, but the website made it so easy with the use of a simple VPN and no age verification. In essence, he stole online coins from targets to play other online games.

Mr. Urban also traded a small portion of the cryptocurrency he took for actual cash through peer-to-peer services that would bring cash to his house in exchange for the crypto transfer on the blockchain. The crypto ATMs charge

fees between 9%-30% on the assessed value of the crypto currency at that moment in time, and instead of connecting to a bank, they connect to the blockchain and then use third party providers to agree to make cash withdrawals. Before cryptocurrency can be turned into cash, it must be traded on some form of medium or exchange, much like a baseball card must be traded at a shop.   Unlike baseball cards however, there are a select few online platforms that will trade cryptocurrency as payment towards gift cards for other services based on the perceived value of cryptocurrency to USD at that moment in time.

Mr. Urban used this cash to pay for his rent and utilities. This money allowed him to move out on his own at 18 years old, rent a nice house, and to stay home and be online all day without having to get a "real job". He was able to trade some crypto currency for gift cards to Air BnB and online food delivery services. He purchased a few watches, some of which ended up being counterfeit.

While his mother grew increasingly concerned about Mr. Urban's online activities, Noah pulled farther away from her and her influence. His father, on the other hand, appeared to be very proud of his son, and his ability to turn into a "crypto millionaire".  When the F.B.I. came and raided Mr. Noah's rental

home, he was only 19 years old. They came asking about incidents that had happened several years before, when he was just a high school kid. Everything in Noah's life came to a screeching halt. By the time the F.B.I. found Noah, he had already begun moving away from the "SIM Swapping" community and was primarily focused on music companies and online gambling.

## Promoting Respect for the Law and Just Punishment

Mr. Urban understands that he must be held accountable for his actions in this case. He is being held accountable for his actions, as well as the actions of his co-conspirators. The question really is how much time is owed in prison for this type of virtual currency theft? Many of the victims relate through their impact statements that this theft affected their "investment accounts". To be clear, crypto-currency speculation is not an investment account.

## Protecting the Public

This court should have no concern that Mr. Urban is a threat to the public. There is no indication that Mr. Urban would physically harm anyone, and this period of incarceration is enough to dissuade him from future financial crimes. The government seized all his virtual assets as part of the raid on his home.

**General and Specific Deterrence**

Mr. Urban is personally deterred from committing this conduct based on the amount of time he has already spent in custody and his future in federal prison. Cases like his have been in the news, with each person receiving prison time. There is not a reason to think that Mr. Urban's case in particularly would dissuade any would-be hackers based on the sentences already handed down to similar defendants by other courts.

**Sentences for Similarly Situated Defendants**

The law enforcement community is years behind in prosecuting these hacking schemes. It has taken the F.B.I. years to unravel cases that occurred in 2020-2024. Because the cases are often located where the victim's live, there is not a centralized jurisdiction dealing with most of these cases. Here are some examples of similarly situated defendants and the sentences they received:

1) In case CR-23-00680-PHX-DJH, out of Arizona, Jordan Dave Persad, 20, of Orlando, Florida, was sentenced to 30 months in prison, followed by three years of supervised release for conspiracy to commit computer fraud and wire fraud in a sim swapping case. Persad was also ordered to pay $945,833 in restitution.

22

2) 22-year-old Andrew Percy Trujillo pled guilty to one count of conspiracy to commit computer fraud and abuse as well as one count wire fraud in case 5:22-cr-451-JKP-1 out of the Western District of Texas. Trujillo was sentenced to 33 months in prison plus three years of supervised release.

3) 22-year-old Daniel James Junk pled guilty to conspiracy to commit wire fraud, in Oregon case 3:23:cr-85-MO-1. While Mr. Junk was on pretrial in the case, he continued to steal the identity of victims and participate in criminal activity. Because of this behavior his pretrial release was revoked, and he was eventually sentenced to six years in prison with three years of supervised release. In addition, he will have to pay over $3 million in restitution to victims.

4) Nicholas Truglia, of Florida, age 25, was sentenced to 18 months in prison out of the Southern District of New York in case 1:19-cr-921-AKH-1, for conspiracy to commit wire fraud. Mr. Truglia participated in the same type of activity as Mr. Urban. He was also ordered to pay $23 million in restitution for his participation in a SIM-swapping scheme.

5) Joseph James O'Connor," a U.K. citizen, was sentenced out of the Southern District of New York in case 23-cr-225-01 to 60 months in prison for his role in a wide array of cybercrime offenses, including crimes like Mr. Urban's. Mr. O'Connor was also sentenced for making extortive communications, stalking, and making threatening communications in the form of domestic violence. Mr. O'Connor had additional crimes from the Northern District of California that were transferred to the SDNY under Rule 20, like Mr. Urban's.

Mr. Urban is personally familiar with all these defendants, and they were all part of the same online "Community". Some of them even taught him how to do the sim-swapping fraud. The co-defendants in Mr. Urban's specific case have not yet been sentenced.

## Restitution

Pursuant to his plea agreement, Mr. Urban had significant cryptocurrency assets seized and forfeited. He has also agreed to pay significant restitution for actions taken when he was a child in addition to the fraud that occurred after he turned 18. Because all his assets were seized by the Government, he has requested that some of those seized assets be used to

make the victims whole by MLARS. Additionally, his co-defendants have had millions of dollars of crypto-currencies assets frozen to compensate the same victims that are in Mr. Urban's plea agreement.

Some of the victims have indicated they believe they should be entitled to more restitution than the United States Government agreed to in the plea agreement, primarily citing loss of "investment accounts." As a technical point of clarification, traditional investment accounts hold assets like stocks, bonds, and mutual funds, which are tied to underlying companies or debt instruments. These accounts are heavily regulated and subjected to certain fiduciary responsibilities and reporting requirements. Cryptocurrency is not an investment account.

Cryptocurrency's value, on the other hand, is primarily driven by market forces of supply and demand, without any underlying anchoring asset. While one can "invest" in cryptocurrency, by purchasing it, it's crucial for this Court to recognize the distinction between this type of speculative purchasing, and the traditional investment accounts offered by brokerages and financial institutions. Cryptocurrencies are not subjected to government regulation, are not backed by a government, their values change constantly, and if something happens to an account or cryptocurrency funds they are permanently lost.

25

Cryptocurrency purchasers are taking a huge gamble on these unregulated assets. The idea that someone put their entire life savings into cryptocurrency (an unregulated and highly volatile asset) that could easily be stolen by teenagers and now seek to have the government triple their initial investment through a restitution order is not grounded in actual loss but speculative or hypothetical losses.

## Guidelines Arguments

As calculated by the probation department, Mr. Urban's guidelines involve a base offense level of 28 and a criminal history category of I, yielding a recommended sentence of 78-97 months with an additional 2-year consecutive for aggravated identity theft, followed by a period of supervised release of up to three years.

### Zero Point Offender

These guidelines do not reflect the Zero Point Offender adjustment under §§ 4C1.1 because it alleges Mr. Urban caused "substantial financial hardship" to the victims. The caselaw requires the court to look at the overall wealth of the victim before deciding that the loss was a substantial financial hardship. "a loss that has resulted in a substantial hardship ... will, in most cases, be gauged relative to each victim. The same dollar harm to one victim may result

in a substantial financial hardship, while for another it may be only a minor hiccup. Much of this will turn on a victim's financial circumstances, as the district court recognized when it noted that "[a] loss that may not be substantial to Bill Gates may be substantial to a working person." *United States v. Poulson*, 871 F.3d 261, 268 (3d Cir. 2017).

Mr. Urban disputes that the Government has proved substantial financial hardship to the victims in this case. Mr. Urban did not steal money, currency, or regulated investment accounts. Mr. Urban and his co-defendants stole unregulated speculative commodities in the form of cryptocurrency. The idea that the victims placed enough assets into these unregulated, highly volatile, uninsured marketplaces to cause a "substantial financial hardship" to themselves is reckless. All the victims were speculators looking to make significant money quickly based on the high-risk nature of their purchases. While they may have had losses especially in comparison to their hoped financial windfalls, the actual losses they suffered are essentially impossible to account due to the fluctuating value of cryptocurrency.

Many of the victims checked a box on the victim impact form indicating they had "lost investment accounts". It appears that the victims consider the crypto-currency wallet to be an "investment account". This is even though

27

Coinbase's own website says "Coinbase is not registered with the U.S. Securities and Exchange Commission and does not offer securities services in the United States or to U.S. persons. You acknowledge that Digital Assets are not subject to protections or insurance provided by the Federal Deposit Insurance Corporation or the Securities Investor Protection Corporation."[16]

**Age**

The United States Sentencing Commission, by its recent guidelines amendment, now recognizes youth as a basis for a variance from the advisory guidelines range.  The Court may look to the revised Policy Statement contained in § 5H1.1 of the Sentencing Guidelines discussing the defendant's youthfulness at the time of the offense. Mr. Urban's age at the time of these offenses is a factor that the Court may consider in its sentencing calculation. Mr. Urban was only 19 years old when arrested. A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. USSG §5H1.1.

In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. *Id.*

---

[16] Coinbase User Agreement. https://www.coinbase.com/legal/user_agreement/united_states

The Commission made this amendment to the Guidelines, effective November 1, 2024, "in line with the Commission's statutory duty to establish sentencing policies that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(C). The amendment reflects the evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability.

## Conclusion

The mandate of 18 U.S.C. §3553(a) is, of course, for the Court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of that same statute. [17] In *Rita v. United States,* 551 U.S. 338, 347-348 (2007), the Court summarized the now often-cited factors found in that second paragraph: the "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) "just punishment" (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the

---

[17] "It is worth noting that a district court's job is not to impose a 'reasonable' sentence. Rather, a district court's mandate is to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes" of section 3553(a)(2). Reasonableness is the appellate standard of review in judging whether a district court has accomplished its task." *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006)

Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution."[18]

In Mr. Urban's case, his guidelines are driven primarily by the speculative loss amount, to which Mr. Urban agreed via plea agreement. We are asking this court to grant a variance and to sentence Mr. Urban to 36 months concurrently on the two counts of wire fraud, and conspiracy to commit wire fraud, followed by two years for aggravated identity theft with supervised release to follow.   This sentence is consistent with other similarly situated defendants.

---

[18] *See also United States v. Hunt*, 459 F.3d 1180, 1182 (11th Cir. 2006).

A cumulative five-year sentence is sufficient, but not greater than necessary to punish Mr. Urban for conduct in this case. It offers significant incarceration while providing adequate consideration his of youthful, impulsive, and frankly, juvenile conduct. It will give Mr. Urban the opportunity to work in the future and provide restitution to the victims that may not be covered by the forfeiture.

Dated:  August 8, 2025.


Respectfully submitted,

A. FITZGERALD HALL
ACTING FEDERAL DEFENDER, MDFL

*/s/Kathryn Sheldon*
Kathryn E. Sheldon, Esq.
Assistant Federal Defender
Florida Bar No. 1019538
200 W. Forsyth St, Ste. 1240
Jacksonville, Florida 32202
E-Mail: Kathryn_sheldon@fd.org
Counsel for the Defendant

31